22-5469 Nissan North America Inc. v. Continental Automotive Systems et al. Or argument 15 minutes per side. Mr. Bolso for the appellant. Thank you. You may begin. Good morning members of the court. My name is Gino Bolso. I'm the attorney for the appellant Nissan North America Incorporated. This is an indemnification action that comes to this court from the lower court's disposition of cross motions for summary judgment. Nissan originally filed this action because it paid $30 million in damages and costs arising out of a product liability case in Los Angeles that itself arose out of claims that parts that Continental provided to a braking system were defective. Nissan made the demand on Continental to pay the $30 million by way of reimbursement pursuant to the agreement and it refused and so Nissan filed this case. I'm going to use my time this morning simply to walk through the agreement and the record from the California case which demonstrates that Nissan is in fact entitled to a judgment against Continental for $30 million. But before I do that I wanted to highlight one key fact and one key proposition of law. The key fact is that in the underlying action the only parts claimed to be defective were those provided by Continental. The key proposition of law is that under California law the preclusive effect of a judgment is determined by a careful examination of the entire record. In other words a court may not simply look at a verdict form or one document but rather must consider the entire record in determining the preclusive effect of a judgment. I hate to continental parts but isn't there some debate here as to whether this OHB function could have been responsible for the malfunction that led to the accident and so it's conceivable that the Continental part might not have had anything, may not have been defective or was defective, may not have been the cause of the accident? Well there's no question that both the trial court and the California court of appeals found that the jury concluded that switching to OHB, this optimized hydraulic braking system, was the cause of the collision. But Judge Clay it was Continental that provided the OHB. That's part of the components that it provided to Nissan as part of the overall braking system. Did Continental provide it at the direction of Nissan? In part. What was clear from the California court of appeals ruling was that it was Nissan that settled on the activation strategy. That is Continental provided this software and it gave manufacturers an option. You could either activate OHB in the event of a C1179 diagnostic code or you could leave it unactivated. Nissan chose for safety reasons to activate it and ultimately what occurred here according to the plaintiff's expert witness in the underlying case is that it was a combination of the defective original calibration of the software combined with the activation strategy that caused the collision and the plaintiff's expert Dr. Jonas Kanellakopoulos who was referred to oftentimes as Dr. K was very clear in his testimony that it took both the original calibration defect and the OHB strategy to result in the collision. And both of those things come through very clearly when we look at the underlying record. After the jury's verdict there were post-trial motions filed and one of the motions that Nissan filed of course was a motion for a new trial. And the trial judge in California, Judge Hammond, was very dramatic in a sense when he said in his view the plaintiffs proved beyond a reasonable doubt that the Delta Stroke Sensor software, the original calibration of the software, was defective. And he made that finding in his own words as the 13th juror. So we have here... But that, can I ask you a question though? Because it seems to me in reading the Court of Appeals opinion that, okay, so there's joint and several liabilities. So we know at least that Continental is responsible for something, right? It could be just in the chain of distribution under California products law. So it may not be that there's much that they're responsible for. Or maybe all of it, I don't know. The Court of Appeals seemed to think that Nissan, there was some evidence that Nissan did something that contributed to this, to this breaking system design. That was the question that the jury answered. I guess I don't understand why this is kind of an all or nothing proposition. Why would it be $30 million or zero? Why isn't there comparative fault between the two parties? And California has a comparative equitable indemnity law. This contract provision talks about causation. It could in theory be 50-50 in my mind, or maybe something else. But that's not the way you've litigated the case. You've litigated it as zero or 30. And I'm not sure I can see 30. I mean, maybe it would have been something else. But I guess I'm a little bit confused as to the strategy here. Those are all very good questions, Judge Nalbandian. And let me approach it this way. The reason for 30 is because of the terms of the agreement. The indemnity agreement between the parties is governed by Tennessee law. And Tennessee interprets contracts in accordance with their meaning. And here, the contract that the party signed said that Continental's liability includes damages and costs that arise out of claims for personal injury caused directly or indirectly by defective parts supplied by Continental. And it's that directly or indirectly language that is key here. Because all members of the panel have focused on the fact that according to the appeals, it was Nissan that decided on this activation strategy. But it took both the defective original calibration of the software and the OHB strategy, that is to activate OHB in the event of the false C1179 code, to cause the accident. And so although one could very plausibly look at this, Judge Nalbandian, as Continental was at fault for the original calibration, that was their fault, that their system was throwing off these false C1179 codes. And then one could plausibly say, well, it was Nissan's problem that that caused the switch to OHB because Nissan decided that. But under the terms that the parties agreed to, under those circumstances, Continental was liable because its defect, the C1179 defect, indirectly caused the damages under that scenario. Well, we don't know who is at fault because that's never been adjudicated. And Judge Nalbandian was asking you about comparative fault. But that cannot be addressed based on what's been litigated up to now, I wouldn't think, because there's been no, the issue of who's responsible, what part was defective or not defective and all that has never been litigated. And as I understand, Continental offered to litigate that and didn't want to do that. So it seems as though you're putting all of your argumentation on the interpretation of that section eight of the terms and conditions of the contract. And of course, the problem there is that if we don't agree with your assessment of what the meaning is of section eight, then your argument might run into problems. I've got two responses, Judge Clay, if I might. First, there's no issue of comparative fault in the case because the underlying case was tried on the basis of strict liability. So fault doesn't enter into it. It's just a question of whether the design caused the collision. And if so, whether the benefits outweighed the risks of the design. So in the underlying action, comparative fault wasn't an issue. And it's not an issue here because this is a contract case that's governed by contract principles. And one thing- Do you agree that the contract requires an actual finding of a defective part by Continental? Not exactly, Judge Moore. What I would agree to is that for Nissan to recover, the claim that the plaintiffs made in Los Angeles that Continental's part was defective had to have been successful. And so we know that that occurred. The plaintiffs claimed that the software that Continental provided was defective in two respects. One, the original calibration. And then secondly, the actuation strategy. In both the post-trial rulings from the trial judge and the California Court of Appeals are clear that the jury found both of those things, which is why Judge Nalbandian is correct when he refers to the fact that in this opinion, in fact, in the very last sentence, the California Court of Appeals said Continental and Nissan were jointly and severally liable for the product liability claim. That's a finding by the California Court of Appeals. And that could only be true if, in fact, it was Continental's parts that were responsible for the injury. Otherwise, the California Court of Appeals could never have said that Continental and Nissan are jointly and severally liable. So in one sense, Judge Moore, yes, there does need to be ultimately some finding that the part Continental provided was defective. But here we have that based on Judge Hammond's post-trial rulings and based on the Court of Appeals ruling. And also we have issue of attorney's fees that is involved in the case. And the court's issue, the court's ruling with regard to attorney's fees was inaccurate because it's simply a sua sponte that had never been presented before. I wonder what the context of this statement about joint and several liability was because we certainly don't have a judgment of any court that says that. In what sense are you saying that the California Court of Appeals said that there was joint and several liability, whatever it is that you're saying that they said in that regard? In the sense, Judge Clay, that when you look at the very last sentence of their opinion, they expressly state, and this is a quote, Continental and Nissan were jointly and severally liable for the product liability claim. And they weren't referring to some judgment that was filed, finding both Nissan and Continental jointly and severally liable. What they're saying is that when you look at the claim that was raised by the plaintiffs, the claim that was raised, if successful, was one for which Continental and Nissan were jointly and severally liable. So the Court of Appeals there is recognizing that the actual claim that was raised in the case dealt only with Continental defective parts. And the reason that Nissan has indemnification rights is because of the language in the indemnification agreement that says explicitly if Continental provides defective parts that directly or indirectly cause damage, Continental is responsible for it. And that is simply what occurred here. Any further questions? Thank you. We'll go to the other side now. Mr. Donovan. Thank you, members of the Court. I'm happy to be here today. I'll jump right in. This case is, as we've been discussing, about the application of one section of the terms and conditions. That's what's been litigated for purposes of this appeal. And it's called seller's liability. It's there's no reference to identity in the title or in the body of the document. There's no reference to alleged. There's no reference to fees. And in order to understand how Judge Trauger had interpreted this, we need to look at just three things. What a break system does and how it works. What was and wasn't tried with regard to that break system in the underlying trial. And what paragraph of the party's contract required. Moving to paragraph eight, section eight, the seller's liability section. It determines the types of claims for which Continental must indemnify Nissan, personal injury and property damage claims, in the circumstances under which it must do so when caused directly or indirectly by defective Continental parts. The Continental component is in a break system. It's simply part of a system. A break system goes from the pedal all the way to the wheel end. And you have all sorts of things that need to work together. So Nissan needed to establish a defect in the Continental parts and that they caused the accident. Judge Trauger invited this to occur a year before the second summary disposition motion was filed. And as she points out, Nissan declined to do that. One of the things that also needs to be addressed here is break feel is intentional. And it's the product of many Nissan decisions. It's a target controlled by Nissan. Many things influence break feel. So when Nissan in Japan through its break system engineers designed this break system, they planned it, they sized it, they picked all the components from the pedal to the wheel end. They integrated those together like a... But as I understand, as I understand, Nissan then in the process misfired and sent a signal that then led to this cascading series of events. So why isn't that part of the breaking system and isn't that part of the jury award in the California case? Because the efficacy of the breaking system is determined by the integration of the parts, Your Honor, including the pedal, the booster, the reservoir, the calipers, the friction material. It all works together as a system. And the product and system that was on the verdict form and that was the subject of the trial was the Nissan break system. That required, as part of one of its components, a booster, which is a vacuum booster, which is described in the papers. In the event that the booster wasn't available, there was a substitute force multiplier because that's what a booster does. And that was the OHB function, which simply substituted the use of a pump to create the pressure that would normally be created by the pedal pressure affecting the vacuum. But I understand your opponent to be arguing that the DSS misfiring was what caused this chain of events and that that's... They're arguing that that's what the evidence at the California trial showed. And there's a verdict that the breaking system malfunctioned and an award of a large amount of money. So what's wrong with that argument? Because the... Actually, if you start with why the case was filed, it's because Mr. Mathenge thought he had lost his brakes. He was pumping his brakes. He was going up and down. Nothing happened. I started panicking. The reaction to the braking system functioned exactly as Nissan decided and intended it to. When they tuned and tested it and it shows the optimized hydraulic braking parameters, the ratios, when it did all that and everything worked exactly as intended, the jury said, hey, people are surprised. They're panicking. And that is a defect. That system and its impact on the users is the defect. And as the plaintiff's attorney said in his closing argument, you don't have to believe him. You're free to believe the 4,500 people who said that their brake pedal went to the floor. One of the things you were told in the papers here, this wasn't a pedal feel case. In fact, pedal feel infected the entire case. It was the system that was on trial. And as Joe Trouter properly noted, that system was never broken down. It was constituted with parts for purposes of the verdict, which only looked at the system. It doesn't say... But why... I mean, there is something that triggers the OHB having to make that decision, which could or could not be defective, which is allegedly your part. But beyond that, why... I mean, the liability is joint and several. The settlement that was paid was offset, which means there has to be some fault somewhere from Continental. Otherwise, that Prop 51 wouldn't have kicked in, right? And the complaint clearly alleges that Continental supplied defective parts. I mean, it's not... I don't know where you go. It seems to me that Continental's fault is more than zero. It may be that it's just related to the chain of distribution, I guess, would be the argument under California product liability law. But I think that joint and several has to mean something. But it wouldn't establish that a defective part caused the problem. Because a C1179 is a code that exists for a purpose. It's intended to signal the operational capacity of a sensor, an important sensor. And the only reason it's relevant here is when that code was set, Nissan said, one of the entry criteria, not all of them, one of them, for OHP being activated would be whether or not you have vacuum. They say, when we see a C1179, assume you have a loss of vacuum. That's the choice that the other manufacturers didn't make. And then they made choices. So, that's the choice regarding the OHP strategy. And then they made choices regarding how it actually worked by having their engineers test, tune, and test to select the relative ratio and the efficacy of the system. And that's why all the evidence we developed in this case was never litigated in the last case regarding real concerns regarding the efficacy of the system, the base break system, which their own engineers. Okay. I understand some of that, not all of it, in California. What did you do that made you liable? I think the judge was doing the narrow question of whether or not to assign a settlement credit as an offset under the California Prop 51. But I don't believe there was an express condition made as part of that finding that there was any connection between the C1179 and the accident. But how could the Court of Appeals state, because Continental and Nissan were jointly and severally liable for the product liability claim, it was not an abuse of discretion to credit the settlement amount. So, that seems to be a statement. Continental and Nissan were jointly and severally liable for the product liability claim. So, can you explain how you are not therefore found at fault in part? Because the plaintiffs never litigated that issue at the time of trial and Nissan never invited them to. There was no material from which that judge in the Court of Appeals could have reached a conclusion that anybody had pled and proved defect in a part causing the accident. In fact, the Court of Appeals does not offer the expert opinion that a C1179 caused the accident. It does, in fact, also make clear that the brake system was causing people to feel as if they had no brakes and panic. They argued that the evidence showed Methangay panicked. They were looking at it properly as an entire system. And to the extent you can apply anything in there, there's thrown in throughout this opinion, the references to the chain of parts in the chain of supply. But there are no references that are relevant to the requirement under Section 8 that the claim be caused by a defective part, that the actual damages be caused by an effective defective part. And that's because Nissan should not have litigated that issue. Do you agree that if Nissan had wanted to try to below a comparative fault or brought in evidence, they could have tried to bring in evidence that the part was defective? Or would they have been barred from doing that? Well, they could do so on the alternative, say it's not defective. To the extent you find a defect, it lives only within this part and not within our system. But that's not the way the case was litigated. In fact, Nissan told the California jury that there was no defect. They told the National Highway Traffic Safety Administration there was no defect. They concluded that internally, and they've been consistent in that. And then when invited to make the case in Tennessee, they decided not to do so. And remember what they did in California and why this issue wasn't litigated. So when they were told, you know, you've got a problem here, because people are panicking, they said, that's not a problem. That's design intent. It wasn't, as the papers say, a fact of life. It was a choice. And Mr. Smith confirmed during the trial that the feel and during deposition was not tuned. That feel is a target for brake systems, but they chose not to do so for OHB. That's another decision related to OHB. And it's also the whole operation of all these systems in the feel that Mr. Metheny was talking about and the Court of Appeals focused on lives in the entire system working together as a system. And I think that's what the judge was comprehending, Trauger, when she talked about the multiple layers of allegations that were contained, not only in the complaint, but in the trial record. So you agree that in Judge Trauger's court, both sides had the opportunity and Nissan did not take advantage of that opportunity to show that the continental part was the cause of the problem. Agreed. Not just an opportunity, Your Honor, an obligation. And that was found in response to the first motion for summary judgment, which narrowed the case to the under Section 8. And the judge was clear that defect and causation in that first opinion needed to be proven. And then she was very clear that Nissan, through its strategy, spurned that invitation and requirement of the plain language interpretation that's contained in her first order and then reflected in her second order on the second motion for summary judgment. If we were to disagree with you about what the California court's judgment was, would principles of collateral estoppel preclude you from re-litigating that? No, it would not, because you don't have the same exact issue. You had a trial on the system and not just our part. We weren't available to litigate it. And the proofs simply weren't established with regard to that. And I think that is all over Judge Trauger's opinion why that's accurate. And she references multiple parts of the record and the statement of undisputed facts and the response. One of the things that you have to remember when you're looking at this whole thing is Nissan was design responsible on the system integrator. Nissan knows that everything affects feel. The size of the brake caliber, the friction materials, the diameter of the rotor, the master cylinder size, the brake pedal ratio, all those things affected feel. Nissan chose not to defend its systems and try the case that way. What did they do in California? They said, Mr. Methenge was old. Older folks are prone to making mistakes. Mr. Methenge was speedy. Mr. Methenge had pedal confusion. And to the extent people don't like the feel of the brake system, we're here to tell you it's working exactly as a system as we intended it to do. And everything that it's doing and that you feel was consistent with our design intent. So was there any evidence that there were other problems with the system other than the ones that we've talked about? The problems with the system are pedal travel, pedal feel, feedback, brake efficacy, not stopping, running stop signs. There were other similar incidents showing as a whole this brake system had a significant number of problems. And one of the things we highlight in our brief is that those same problems, and those live in what I'll call the foundation brake system, that's the actual brake system that is causing the friction at the wheel ends, which causes the coefficient of friction at the tires, which causes you to stop. Did the brakes work on this gentleman's car? The post-incident inspection said that they did. Both the foundation, you know, the foundation brakes were found to be working. There was no evidence of any issue with the vacuum or the cylinder. And that was the inspection that was done, I believe, by Mr. Arndt on behalf of the Los Angeles Police Department. But the allegation was that he was getting feedback from the feel of the brake that might have misled him as to whether the brake was properly operating or working. There was evidence as to that, as I am mistaken, right? Actually, he doesn't describe the feedback, Your Honor. He describes the lack of braking efficacy, pumping the brakes in the no field. His description of the event doesn't match some of the descriptions of having an unusual feedback and a noise that you hear from the other similar incidents. And that's actually something that Nissan pointed out pretty carefully in its closing arguments. Any further questions? Well, just one thing here. With regard to Section 8, and I'm sure this is an oversimplification, but your argument in part, and tell me if this is not right, is that your client would not be liable for indemnification unless there was actually a defective continental part. And further, that's never been ascertained or adjudicated. Whereas, and this is an oversimplification, I know Nissan's argument would be under Section 8 and under the language there that if there is a claim asserted that would implicate whether or not that the continental part might be defective, there would be indemnification regardless of whether the part was in fact defective. That is a correct summary of the arguments as I understand them. But Nissan actually takes claim and turns it from a noun to a verb. Paragraph 8 only clarifies the two categories of claims as a noun that are covered. And those are claims of personal injury or property damage. And what they try to do in this argument at page 35 of their brief is to suggest that it is actually a verb. And it's not. Claims is susceptible to a clear meaning here, and only one meaning is the noun. All right. No further questions for me. Thank you for your argument. I believe we have some rebuttal time. Yes, Your Honor. Thank you. And let me begin with posing this question. Was there a finding in California that Continental's original calibration of the Delta stroke sensor was defective? Or to use Judge Moore's terms, was there evidence in a finding that the DSS misfired and then set in process this chain of events that led to the collision? I think the answer to both of those questions, which is essentially the same question, is yes. I hate to interrupt you, but you made reference to the Continental braking system being defective instead of a part manufactured or provided by Continental. Is there any significance to the fact that you're not talking about defective parts from Continental? You're just talking about a defective system now? No, Judge Clay. I mean to refer specifically to the Delta stroke sensor and the software that interprets the signal. The question is, was there a finding in California that that Delta stroke sensor and the signal it sent and the software that interpreted was defective? And Judge Moore framed that question a little differently. Did the DSS misfire and set in a chain of motion the events that led to the collision? Where is that finding? That finding is in Judge Hammond's post-trial ruling that beyond a reasonable doubt, the plaintiffs proved that the Delta stroke sensor and the original calibration of it was defective. I mean, it's present at docket 209-46, page ID 15574. And it's also present. Excuse me. I'm sorry. Go ahead. No, it's also present, Judge Moore, in the Court of Appeals decision. Counsel, he says that's a reason. That's one reason he gives for denying a post-trial motion, you know, that there was ample evidence that the thing was defective. But I don't think that means there's a finding, do you? I mean, I think that means a rational juror could have relied on that. But that suggests to me that there are other things a rational juror could have relied on in rendering a verdict. The specific question in the jury verdict was, was the system, was there a design defect in the brake system? And I don't know that that gets us, I mean, I'm with you on some of it. I mean, yes, there's certain several liability. Yes, there's evidence that there's DSS had a problem. Yes, you know, there's some other things. And it looks like that's the way they litigated the case. But where, is that enough to get us to, that's $30 million because that's what it's pinned on. Not just that, Judge Nalbandian, no. But remember, the California cases require that we have a careful examination of the entire record. And that leads us directly to the California Court of Appeals decision. You look at page star 13 of that California Court of Appeals decision, in the very last line of that section, they say that Mr. Methange met his burden of proving that switching to OHB caused the collision. And Nissan failed to meet its burden that the risks of the false C-1179 code was outweighed by the benefit of the original calibration. What the Court of Appeals is talking about right there, Judge Nalbandian, is this original calibration of the software that interpreted the signal from the delta stroke sensor. And we've got the court right here saying that that was the issue on which the case turned. That Mr. Methange met his burden of proving switching to OHB caused the collision, and Nissan failed to carry its burden to show that the risks of the C-1179 were outweighed by the benefit. That's all Continental's work. That's all Continental software. And so if we do have a finding, as I submit we do here, when you look at California law, the finding only has to be what they call sufficiently firm. We've got Judge Hammond saying it's beyond a reasonable doubt. Wait a minute, Pat. Yes, Judge Glynn. Quoting these judges post-judgment in terms of how you say the judges characterize what's been judicially determined, but when I look at the special verdict form from the California litigation to see what the jury actually adjudicated and found, I don't see anything like that in the special verdict form. And there's something in California law wherein a judge who's not trying the case as a finder of fact can adjudicate a claim and go beyond or come up with something different than the jury verdict. And that has to be followed for purposes of, I don't know, that you would follow any determination of a judicial claim and for purposes of collateral estoppel. In other words, these quotes you're ascribing to these judges, where has it been adjudicated to support these statements you're quoting? Because it's not in the statute. Sure. I've got three responses, Judge Clay. It's a very good question. And it's one that, in our view, respectfully, the district court answered incorrectly. First, recall that under California law, when you're dealing with a design defect claim, expert testimony is required. That's the Howard versus Omni Hotels case that we cited in our brief. So, when you're looking at the actual record, the only design defect that could possibly be found had to be one that was supported by expert testimony. Here, it was Dr. K that provided the expert testimony. His testimony is crystal clear that it took both the design defect in the original calibration of the delta stroke sensor and the activation strategy to switch to OHB to cause the collision. Your time has expired. I want you to answer Judge Clay's question, but if you can just tick off the 1, 2, 3 so that we not overlap too much. Second, Judge Clay, we have the fact that Judge Hammond made his ruling as a 13th juror, which means that the other 12 jurors previously made the same ruling. And the third point is that when you look at that joint in several languages at the very end of the California Court of Appeals decision, there's no way to interpret that except to conclude that there was a finding that Continental's delta stroke sensor was defective. Thank you all very much. Thank you. The case... Sorry, did someone... May I add one clarification? There was a lot of discussion regarding Kanopolis. I wanted to make... If no, I'll stop. Normally, we don't allow a sur rebuttal, so I think we'll call it an end for this case in terms of the oral argument. Obviously, the judges will be looking at it carefully and you'll receive a resolution in due course. And we thank you for your argument and the case will be submitted and the clerk may adjourn court.